# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**Misc. Dkt. No. 2025-10**

————————————

**UNITED STATES**
*Appellant*

**v.**

**Kenneth P. ARMOUR II**
Senior Airman (E-4), U.S. Air Force, *Appellee*

————————————

Appeal by the United States Pursuant to Article 62, UCMJ

Decided 5 December 2025

————————————

*Military Judge*: Nathan R. Allred (Article 30a, UCMJ, proceedings); Ryan D. Brunson (arraignment and pretrial motions).

*GCM convened at*: Shaw Air Force Base, South Carolina.

*For Appellant*: Colonel Matthew D. Talcott, USAF; Major Kate E. Lee, USAF; Mary Ellen Payne, Esquire.

*For Appellee*: Captain John M. Fredericks, USAF.

Before DOUGLAS, MASON, and KUBLER, *Appellate Military Judges*.

Judge MASON delivered the opinion of the court, in which Senior Judge DOUGLAS and Judge KUBLER joined.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

MASON, Judge:

This case arises out of an interlocutory appeal under Article 62, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862,[1] in a pending court-martial.

The military judge granted Appellee's motion to suppress "searches and seizures of [his] person, deployed residence, electronic devices, email transmissions and any fruits of such searches." The Government moved for reconsideration arguing that the military judge incorrectly concluded that the independent source doctrine was inapplicable to this case and that he incorrectly applied the exclusionary rule to the evidence in question. The military judge denied the reconsideration motion. The Government appealed the ruling of the military judge with regards to the application of the independent source and the exclusionary rule.

We need not address the military judge's application of the exclusionary rule because we find that the military judge held an erroneous view of the law in his application of the independent source doctrine to the facts of this case. Hence, his suppression of the evidence was an abuse of discretion.

## I. BACKGROUND

### A. Initial Discovery and Investigation[2]

On 1 August 2021, an Internet application reported to the National Center for Missing and Exploited Children (NCMEC) that a certain account had uploaded 15 media files depicting apparent child sexual abuse material and shared "apparent child pornography." The report referenced multiple Internet protocol (IP) addresses with the use of that account. Some of the IP addresses associated with this account were utilized to transmit "apparent child pornography." NCMEC eventually forwarded this report to Investigator KF at the Sumter County Sheriff's Office (SCSO), South Carolina. Investigator KF applied for and received a search warrant for subscriber information associated with one of the IP addresses. Only one of the multiple IP addresses associated with the account could be traced to a physical address. This IP address was not one of the IP addresses referenced in the report as transmitting "apparent child

---

[1] References to Article 62, UCMJ, are to the *Manual for Courts-Martial, United States* (2024 ed.); all other references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The Government does not challenge the facts found by the military judge. Therefore, the facts set forth below represent a consolidation of the relevant factual findings from the military judge's multiple rulings on this issue.

pornography." The locations for the remaining IP addresses were "masked" due to use of virtual private networks.

### 1. Search of BB's Home (28 January 2022)

The warrant return indicated that the subscriber was BB at a certain physical address in Dalzell, South Carolina (BB's home). At some point between 25 August 2021 and 25 January 2022, Investigator KF determined that BB was a member of the United States Air Force. She then notified the Office of Special Investigations (OSI) at Shaw Air Force Base, South Carolina, and OSI agents opened a parallel investigation.

On 27 January 2022, OSI Special Agent EP spoke with Investigator KF about the county's investigation. The next day Investigator KF applied for a warrant to search BB's residence. In that warrant application, she only referred to the IP address that led them to the physical address, but was not reported by NCMEC as having uploaded, transmitted, or downloaded any child sexual abuse material. According to the NCMEC report, this IP address was associated to a "suspect login" of the Internet application account, but was not an IP address associated with any of the nine suspected transmissions of suspected child sexual abuse material. The other IP addresses were not linked to physical addresses. The search warrant was issued.

On 28 January 2022, OSI and SCSO executed the search pursuant to the warrant on BB's home. Several electronic devices were seized. During the search, law enforcement noticed postal packages labeled with Appellee's name at the address of BB's home. On an unknown later date, but prior to 10 February 2022, law enforcement conducted a search of the South Carolina Department of Motor Vehicles (DMV) database and verified that both BB and Appellee were residents of BB's home. They were also able to confirm that at the time of conducting that database review, Appellee was deployed to an overseas location.

### 2. Search of Appellee's Person and Deployed Residence (10 February 2022)

On 10 February 2022, Special Agent AG requested search authorization to search Appellee's person and deployed residence. In support of this request, Special Agent AG's affidavit contained essentially the same substantive information as did the request for a warrant to search BB's home. In his affidavit he stated that he spoke with Investigator KF "who provided . . . [that] the IP address [associated with BB's home] was the reported IP address used when uploading [suspected child sexual abuse material] files" and that "Investigator [KF] reviewed 14 media files which were uploaded via application [ ] via [the] IP address [for BB's home]." However, Special Agent AG's affidavit did not mention the other IP addresses referenced in the NCMEC report that were

actually utilized for the uploads of the suspected child sexual abuse material. The affidavit did not, despite having confirmed that Appellee resided at BB's home, reference that Appellee was confirmed to be living at the residence or note a date on which Appellee had deployed to an overseas location. The search authorizations for Appellee's person and deployed residence were granted.

During the search of Appellee's person, OSI seized one Apple iPhone. During the search of Appellee's deployed residence, OSI seized one Apple iPad, one Asus laptop, one HP laptop, and one Micro SD card. As SCSO still had jurisdiction to investigate the case, OSI turned over the seized items to SCSO.

### 3. Search of a Yahoo Account (12 August 2024)

On 19 June 2023, SCSO notified OSI that SCSO's application for a warrant to search the seized devices was denied by a state magistrate judge in South Carolina. The following day, OSI was notified by South Carolina authorities that they were no longer moving forward with prosecuting BB or Appellee.

On 7 August 2023, Special Agent TO submitted a request to the Defense Computer Forensics Laboratory (DCFL) to analyze the items seized from BB's home, and Appellee's person and deployed residence. As a result of the search, DCFL analysts uncovered, in relevant part, evidence of child sexual abuse material possession, viewing, receiving, and distribution on the iPhone and iPad seized from Appellant's person and deployed residence.

On 6 May 2024, OSI agents prepared an affidavit to support a search authorization pursuant to Article 30a, UCMJ, 10 U.S.C. § 830a, for the content of emails in a particular Yahoo account. Initially, the application was denied. Subsequently, Special Agent TO amended the application and wrote, "the NCMEC CyberTipline report placed the device uploading [the suspected child sexual abuse material] at [BB's home] based on the IP address [for BB's home] on nine difference [sic] instances between 13 June [2021] and 31 July 2021." On 12 August 2024, the warrant application was approved by the detailed military judge.

## B. Referral of Charges and Pretrial Motion Practice

On 15 May 2024, the Government preferred one charge and one specification of conspiracy to distribute child pornography, and one charge and one specification each of possessing, viewing, receiving, and distributing child pornography. One additional charge and one specification of conspiracy to distribute child pornography were preferred against Appellee on 14 August 2024, and then all charges and specifications were referred to trial by general court-martial on 14 August 2024. All the charges and specifications were served on Appellee on 15 August 2024.

On 11 November 2024, Appellee moved to suppress the evidence recovered as a result of the searches of his person and deployed residence, including the electronic devices, email transmissions, and any fruits of the searches. After reviewing the filings, taking testimony, and hearing argument of counsel, the military judge granted the motion to suppress. The military judge found that specific statements in the 10 February 2022 affidavit regarding the IP address utilized to upload the child sexual abuse material were false or "at best recklessly misleading." He found that Appellee met his burden showing that the statements were made falsely or with a reckless disregard for the truth. He then found that the Government failed to meet their burden to show that if the false information was set aside, the remainder of the information established probable cause. He concluded that the searches were not otherwise lawful, that inevitable discovery or good faith exceptions were not applicable, and that the exclusionary rule should be applied to this evidence.

For the same reasons, the military judge found that the search of the Yahoo account for email content pursuant to the 12 August 2024 warrant was also unlawful and applied the exclusionary rule.

On 27 February 2025, the Government moved for reconsideration of the grant of the motion to suppress. On 6 March 2025, the military judge denied the motion for reconsideration emphasizing that the information submitted to the search authorities did not present probable cause with the false information excised. The Government subsequently moved for a continuance of the trial. Over defense objection, the military judge granted the continuance.

## C. New Search Authorization for Appellee's Items (24 March 2025)

Following the grant of the continuance, on 10 March 2025, trial counsel began collaborating with agents from the OSI detachment at Shaw Air Force Base to prepare a new affidavit for search authorization for the previously seized items. All of the items remained in government custody from the time they were seized. After some back and forth regarding what language Special Agent TS could attest to, a new affidavit was finalized and signed on 24 March 2025. In the affidavit, Special Agent TS references Investigator KF's previous search warrants for the subscriber information and for BB's home as well as the results of those warrants. In this new affidavit, the connection of Appellee to BB's home was based on the fact that investigators saw a package at the home with Appellee's name and BB's home address on the label as well as the search of the South Carolina DMV database, without reference to the dates Appellee lived at the home.

That same day, 24 March 2025, Special Agent TS and trial counsel requested search authorization from the base operations group commander, Colonel MT. During the meeting, Colonel MT asked several questions. One of

those questions was why was he being asked to authorize a search this long after the initial seizure. He was told that there was an issue with the first search authorization due to the use of the words "login" and "upload" being incorrectly used interchangeably. He asked Special Agent TS and trial counsel if there was any reason why he should not sign the requested search authorization. Assistant trial counsel stated that the affidavit was "well-laid out, and made sense," gave verbal and non-verbal affirmations to Colonel MT during his assessment of the affidavit (*i.e.*, head nods and statements of agreement to Colonel MT's verbal analysis of the affidavit). Colonel MT granted the request for search authorization permitting search of the items seized from Appellee's person and deployed residence on 10 February 2022. From these items, DCFL analysts uncovered, in relevant part, evidence of child sexual abuse material possession, viewing, receiving, and distribution on the iPhone and iPad seized from Appellant's person and deployed residence.

**D. Additional Motion Practice**

On 9 April 2025, Appellee's trial defense counsel moved to suppress the search resulting from the 24 March 2025 search authorization. The Government filed their response on 16 April 2025. Neither party requested a hearing on the motion. On 9 July 2025, the military judge issued his ruling granting the motion to suppress.

In his ruling the military judge concluded that the 24 March 2025 affidavit from Special Agent TS did "not contain the offending information, but instead accurately and matter-of-factly establishes a nexus between the NCMEC report that launched this investigation and the ultimate seizure of [Appellee]'s devices." He summarized the "nexal chain" as follows:

> A NCMEC Cyber Tipline reported uploads of child pornography from the [account named] [ ] on numerous occasions between June and July of 2021 as well as a number of logins to that same account; the [Internet application] account was accessed via a residential IP address close in time to the reported upload; that IP address was determined based on a warrant for [the Internet service provider] subscriber information to be associated with the residence shared by [BB] and [Appellee] in Dalzell, South Carolina; a search of that home and review of the South Carolina DMV records revealed [Appellee] to be a resident of the home.

The first reason for Appellee's challenge to this search was that there was not a sufficient basis for Colonel MT to find probable cause. Affording the appropriate deference to Colonel MT's decision as the search authority who authorized the search, the military judge found that "the information that *was* presented established a substantial basis for a finding of probable cause."

The military judge next analyzed whether the independent source doctrine applied to this search considering the 10 February 2022 search was found to be unlawful. The military judge determined that the circumstances in this case did not indicate that the 24 March 2025 search was genuinely independent of the prior, tainted search. He again applied the exclusionary rule and granted Appellee's motion to suppress.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The Government asserts that this court has jurisdiction to hear this appeal under Article 62(a)(1), UCMJ; Appellee does not contest this assertion. In accordance with Article 62, UCMJ, the court has jurisdiction to hear this appeal in that the Government may appeal "[a]n order or ruling which excludes evidence that is substantial proof of a fact material in the proceeding." 10 U.S.C. § 862(a)(1)(B).

When the Government appeals a ruling under Article 62, UCMJ, "this court reviews the military judge's decision 'directly and reviews the evidence in the light most favorable to the party which prevailed at trial.'" *United States v. Lewis*, 78 M.J. 447, 453 (C.A.A.F. 2019) (quoting *United States v. Pugh*, 77 M.J. 1, 3 (C.A.A.F. 2017)). Because this issue is before us pursuant to a government appeal, we "may act only with respect to matters of law." 10 U.S.C. § 862(a). We are limited to determining whether the military judge's factual findings are clearly erroneous or unsupported by the record. *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004).

A military judge's ruling suppressing evidence from a search is reviewed for an abuse of discretion. *United States v. Brinkman-Coronel*, 85 M.J. 431, 438 (C.A.A.F. 25 May 2025) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)). "The military judge's findings of fact are reviewed under a clearly erroneous standard and conclusions of law, de novo." *White*, 69 M.J. at 239 (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). "An abuse of discretion occurs when a military judge's findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Shields*, 83 M.J. 226, 230 (C.A.A.F. 2023) (internal quotation marks and citations omitted).

**B. Admissibility of Suppressed Evidence**

**1. Law**

A search authorization, whether for a physical location or for an electronic device, must adhere to the standards of the Fourth Amendment of the Constitution. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. This insistence on particularity is a defining aspect of search and seizure law.

> The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

*Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "The Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings." *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999).

Probable cause relies on a "common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband will be found in a particular place." *United States v. Leedy*, 65 M.J. 208, 213 (2007) (quoting *Illinois v. Gates*, 462, U.S. 213, 238 (1983)) (additional citations omitted).

When reviewing an authority's grant of search authorization, a court considers whether the authority had a "substantial basis" for concluding that probable cause existed. *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (citation omitted). "A substantial basis exists when based on the totality of the circumstances, a common-sense judgment would lead to the conclusion that there is a fair probability that evidence of a crime will be found at the identified location." *Id.* (internal quotation marks and citations omitted). Courts grant substantial deference to an authority's determination of probable cause. *Id.*

"Searches conducted pursuant to a warrant or authorization based on probable cause are presumptively reasonable, whereas warrantless searches are presumptively unreasonable unless they fall within a few specifically established and well-delineated exceptions." *United States v. Lutcza*, 76 M.J. 698, 701 (A.F. Ct. Crim. App. 2017) (citing *United States v. Hoffmann*, 75 M.J. 120, 123–24 (C.A.A.F. 2016)).

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988) (citations omitted). This rule also prohibits the introduction of evidence "up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Id.* at 537 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)) (additional citation omitted).

"Almost simultaneously with our development of the exclusionary rule, in the first quarter of [the 20th] century, we also announced what has come to be known as the 'independent source' doctrine." *Id.*

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Id.* (alterations and omission in original) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)).

The ultimate question when determining whether the independent source doctrine will permit the admission of evidence originally unlawfully seized is whether the subsequent search "was in fact a genuinely independent source of the evidence" in question. *United States v. Budd*, 549 F.3d 1140, 1147 (7th Cir. 2008) (citing *Murray*, 487 U.S. at 542).

The United States Supreme Court in *Murray* set forth a two-part test to determine whether evidence initially obtained unlawfully has later been independently obtained through an untainted source. 487 U.S. at 539–40, 542. The Government must show that no information gained from the unlawful search affected either (1) "the law enforcement officers' decision to seek a warrant;" or (2) "the magistrate's decision to grant it." *United States v. Saelee*, 51 F.4th 327, 335 (9th Cir. 2022) (quoting *Murray*, 487 U.S. at 539–40). "Affect" means "affect in a *substantive* manner." *United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992); *see also United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005) ("All courts of appeals to have considered the matter, however, have interpreted *Murray* to mean that, in these situations, for evidence to be inadmissible . . . the tainted information presented to the judge must affect the judge's decision in a *substantive*, meaningful way." (citations omitted)). The Government is not required to make a showing that a magistrate's decision was

"entirely independent of the information discovered during the illegal [search]." *Herrold*, 962 F.2d at 1142. Rather, the Government is required "to establish that a *neutral* justice would have issued a warrant based on the untainted information in the affidavit which the police had acquired prior to their [illegal search]." *Id.*

"To determine whether the warrant was independent of the illegal [search], one must ask whether it would have been sought even if what actually happened had not occurred . . . ." *Murray*, 487 U.S. at 542 n.3. Where "it is clear that the police were motivated by circumstances independent of their initial [illegal search] to seek a warrant," the decision to seek the warrant is not "affected" by information gained from the illegal search. *Id.; see also Saelee*, 51 F.4th at 335 (holding that suppression is unwarranted where evidence initially the consequence of an unlawful search is later obtained independently from activities untainted by the initial illegality ensuring the police will be placed "in the same, not a worse, position that they would have been in if no police error or misconduct had occurred").

"[A]n independent 're-seizure' can cure an earlier illegal seizure in the same way a valid later search can cure an earlier illegal one." *United States v. Grosenheider*, 200 F.3d 321, 329 (5th Cir. 2000) (citing *Murray*, 487 U.S. at 542).

There is no constitutional right to destroy evidence. Such a "concept defies both logic and common sense." *Segura v. United States*, 468 U.S. 796, 817 (1984) (citing *Nardone*, 308 U.S. at 341).

"[A]lways under the Fourth Amendment, the standard is reasonableness." *Shields*, 83 M.J. at 232 (internal quotation marks and citations omitted).

**2. Analysis**

We are called upon to review the military judge's determination that a search conducted pursuant to a granted search authorization, and therefore presumptively reasonable, was in fact unlawful.

The initial searches conducted of Appellee's person and his deployed residence were conducted pursuant to a search authorization. The military judge determined that these searches were unlawful due to deficiencies in the affidavit. The pertinent matter before us is whether the subsequent search pursuant to a later-granted search authorization was genuinely independent of the initial search. We hold that it was genuinely independent. Thus, a correct application of the independent source doctrine results in the evidence in dispute being admissible.

To make this determination, we apply the Supreme Court's two-part test as set forth in their *Murray* decision. 487 U.S. at 539–40, 542; *see also Saelee*,

51 F.4th at 335 (citation omitted). As we do so, we acknowledge that though there appears to be, as the military judge noted, a dearth of military case law on this issue, every Federal Circuit Court of Appeals has applied the *Murray* test. *See, e.g., Saelee*, 51 F.4th at 335–38; *United States v. Green*, 9 F.4th 682, 693 (8th Cir. 2021); *United States v. Amador*, 752 F. App'x 541, 548–49 (10th Cir. 2018); *United States v. Mulholland*, 702 F. App'x 7, at *10 (2d Cir. 2017) (order); *United States v. Barron-Soto*, 820 F.3d 409, 415 (11th Cir. 2016); *United States v. Budd*, 549 F.3d 1140, 1147 (7th Cir. 2008); *United States v. Jenkins*, 396 F.3d 751, 757–59 (6th Cir. 2005); *United States v. Dessesaure*, 429 F.3d 359, 365 (1st Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 327–30 (5th Cir. 2000); *United States v. Walton*, 56 F.3d 551, 553–54 (4th Cir. 1995); *United States v. Herrold*, 962 F.2d 1131, 1139–40 (3d Cir. 1992); *United States v. Halliman*, 923 F.2d 873, 880 (D.C. Cir. 1991).

The first part of the test focuses on whether information gained from the unlawful search affected the law enforcement officer's decision to seek a warrant. *Saelee*, 51 F.4th at 335. In nearly all of the above-mentioned cases, law enforcement's seeking of a warrant followed a warrantless search, entry, or arrest. In those cases, it is much more difficult to determine whether they would have sought a warrant. In fact, many of those cases have required remand for additional factual findings to determine the issue. Here, that question is not difficult to answer. In this case, law enforcement was from the beginning seeking search authorization for Appellee's person and deployed residence and a warrant for the online communications. At the time they originally sought those items, they had not seen the evidence comprised within. Therefore, we can easily conclude that law enforcement's decision to seek search authorization and a warrant were not affected in any substantive or meaningful way by their obtaining of the items unlawfully initially.

The military judge's own conclusions in his ruling on the defense motion to suppress the search authorization of 24 March 2025 also support this conclusion. He found, "[i]t was not the *information gathered* during the initial illegal search that 'prompted' Special Agent [TS] to seek the instant search authorization. Instead, the desire to seek a new search authorization was prompted by, or premised upon, information already known as of February 2022." Hence, the first part of the *Murray* test is met.

The second part of the test focuses on whether information gained from the unlawful search affected the magistrate's decision to grant the search authorization or warrant request. *Saelee*, 51 F.4th at 335. Again, the military judge answered this question by finding that there was a substantial basis for Colonel MT to conclude that "probable cause existed to reseize and search [Appellee]'s previously seized devices." The military judge further found that the 24 March 2025 affidavit from Special Agent TS did "not contain the offending

information, but instead accurately and matter-of-factly establishes a nexus between the NCMEC report that launched this investigation and the ultimate seizure of [Appellee]'s devices."

As the 24 March 2025 affidavit did not contain any of the incorrect information referenced in the first affidavit or information gained from the unlawful search, and that it provided a substantial basis for the magistrate's conclusion that probable cause existed, the Government has established that a neutral magistrate would have issued the search authorization based on the untainted information in the affidavit which the police had acquired prior to their illegal search. *Herrold*, 962 F.2d at 1142. Hence, the second part of the two-part *Murray* test has been met.

The military judge's analysis of the appropriateness of applying the independent source doctrine should have ended after he made these findings. *Murray*, 487 U.S. at 539. However, it did not. The military judge proceeded to focus on the fact that the items seized remained in government custody from the time of the initial search and seizure that he deemed unlawful. Based on that fact, he speculated that but for the unlawful initial search, the items *could have* gone "stale" undercutting probable cause. This was not the correct legal analysis.

The military judge's rationale would prevent the Government from rectifying a defective warrant when evidence originally seized remains in the Government's possession. It appears that the military judge believed that government possession of previously seized items prevents any second warrant from being independent. He implies that a second warrant cannot be independent because he opines the insertion of potential staleness—which does not exist in this case—must be considered for the second search to be independent. In such a legal universe, where an initially defective warrant led to a seizure of evidence, the warrant could never be reissued because the intervening time between the initial seizure and the reissued warrant *could have* made the evidence stale. This is an erroneous view of the law. In fact, the military judge did not cite and we are unaware of legal authority supporting a proposition that evidence should be suppressed based upon "potential staleness."[3]

The military judge's overarching implication is that for the independent source doctrine to apply, the investigators in this case would have had to return the items seized, specifically, the iPhone and iPad to Appellee shortly after

---

[3] We are unsurprised to find that a *potential* staleness doctrine does not exist in the law. Moreover, we are quite skeptical that such a concept could provide a legal basis for suppression of evidence where there was *no potential for staleness* as the devices were, as the military judge recognized, "frozen" in government custody, pending the litigation in this case.

they seized them and well before they knew the military judge would invalidate the initial search. This impossibility would let a fictional staleness potential play out. This was impossible since the Government believed the evidence supported the search and seizure until they received the military judge's ruling. Even if they could have known this, they could not return the evidence prior to re-seizing the items. Neither the law nor common sense permits, let alone requires, this step or these steps. After having initially seized and searched these items, agents became aware that the items contained child sexual abuse material. Clearly, it would have been unlawful for them to just simply hand the items back to Appellee. *See* Adam Walsh Child Protection and Safety Act of 2006, 42 U.S.C. § 16901. Moreover, Appellee was not entitled to the destruction of evidence. *Segura*, 468 U.S. at 817. The question then focuses on, as all Fourth Amendment searches do, what is reasonable for government officials to have done in this circumstance? *Shields*, 83 M.J. at 232. Here, it was entirely reasonable for investigators to keep the items secured while they sought search authorization before further searching of the items took place. The Government took steps to obtain an independent search authority immediately after the military judge ruled the 10 February 2022 search was invalid. This prompt action also makes the second search eminently reasonable.

In this light, the military judge's focus on potential staleness was misplaced. The *Murray* test was the correct legal test here. The military judge's own findings support the conclusion that the independent source doctrine applies, and this evidence is admissible. Accordingly, the military judge abused his discretion by demonstrating an erroneous view of the law and suppressing the evidence.

## III. CONCLUSION

The appeal of the United States under Article 62, UCMJ, is **GRANTED**. The military judge's ruling on the validity of the 24 March 2025 search and resultant suppression of the searches and seizures of Appellee's person, deployed residence, electronic devices, email transmissions and any fruits of such searches, is **VACATED**.

The record is **RETURNED** to The Judge Advocate General of the Air Force for remand to the Chief Trial Judge, Air Force Trial Judiciary, for action consistent with this opinion.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court